**Bianca NEWGENT, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 25A03–0806–CR–329.

Court of Appeals of Indiana.

Dec. 9, 2008.

Craig Persinger, Marion, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Monika Prekopa Talbot, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BRADFORD, Judge.

Following a jury trial, Appellant–Defendant Bianca Newgent appeals her convictions and aggregate ninety-three-year executed sentence for Criminal Confinement

Resulting in Serious Bodily Injury, a Class B felony (Count I);[1] Assisting a Criminal as a Class C felony (Count II);[2] and Murder, a felony (Count III).[3] Upon appeal, Newgent claims that her convictions for Counts I and II, in light of her conviction for Count III, violate double jeopardy principles. In addition, Newgent claims that her ninety-three-year sentence is inappropriate. We affirm in part, reverse in part, and remand.

## FACTS AND PROCEDURAL HISTORY

As of June 1, 2005, Newgent and her sometime boyfriend Mark Shane Baker co-managed the Rose Dale Motel in Rochester, which was owned by Illinois resident Mustansar Chaudhry. The Rose Dale Motel has a lobby, office, and motel rooms on the ground floor, as well as a second-floor apartment located above the lobby area, which is accessed by an indoor stairway. Baker lived in this apartment.

On October 23, 2005, at approximately 10:00 a.m., Newgent arrived at the motel, where she found Baker. Chaudhry subsequently arrived at the motel, apparently to discuss finances. At approximately 3:00 or 4:00 that afternoon, Newgent heard Baker and Chaudhry discussing money. Brandon Baugh, who was at the motel at the time in a room adjoining the lobby, heard an angry, heated discussion between Baker and Chaudhry.

At some later point Baker apparently collapsed into a seizure in one of the motel rooms.[4] Minutes before Baker's collapse, Baker had told Newgent that he intended to "get money" from Chaudhry. Tr. p. 1043. Chaudhry and Newgent assisted Baker upstairs and into the spare bedroom of his apartment.

As Newgent and Chaudhry were assisting Baker, Baker placed Chaudhry into a headlock, and the two dropped to the ground at the top of the stairway. Baker told Newgent to bring him a hammer. Newgent, who remembered seeing a hammer in the spare bedroom earlier that day, brought Baker the hammer. Baker, using "full fledged swings," hit Chaudhry in the head multiple times with the hammer. State's Exh. 63, p. 7. Chaudhry fell down the stairs. Baker followed and continued to hit Chaudhry with the hammer. Chaudhry pleaded with Newgent to help him. Baugh, who had heard this attack from his nearby room, called 911.

As Baker stood over Chaudhry at the bottom of the stairs, Baker told Newgent to bring him duct tape. Newgent did so, whereupon Baker placed duct tape across Chaudhry's mouth and ordered him to move from the bottom of the stairway to the adjacent laundry room. Baker laid a blanket on the floor of the laundry room, and ordered Chaudhry to lie on top of it, which Chaudhry did. Baker then wrapped Chaudhry's hands and feet with the duct tape Newgent had provided.

Baker asked Chaudhry for the personal identification number to his credit card and took Chaudhry's wallet out of his pocket. At this point, which was approximately 7:30 that evening, Fulton County Sheriff's Deputy Keri Brouyette arrived at the motel in response to Baugh's 911 call. Baker met Deputy Brouyette outside of the motel and told her that two people had been fighting in the lobby but that they

---

1. Ind.Code §§ 35–42–3–3(a)(1), (b)(2)(B) (2005).

2. Ind.Code § 35–44–3–2(2) (2005).

3. Ind.Code §§ 35–42–1–1(1), 35–41–2–4 (2005).

4. The record suggests that there is some question as to the authenticity of Baker's seizures.

had since left. Newgent remained inside the motel, where Chaudhry asked Newgent for help. Newgent did not leave the motel or attempt to speak with Deputy Brouyette. After talking with Baker, Deputy Brouyette left the motel.

Baker re-entered the motel and asked Chaudhry for his credit card. Baker then left the motel, apparently to go to certain ATM machines. Newgent remained with Chaudhry. When Baker returned, Newgent and Baker attempted to clean Chaudhry's blood off of the walls and carpet. Newgent used bleach and another cleaning agent, and she scrubbed the walls and carpet.

Later, Newgent grabbed the bottom of Chaudhry's blanket, while Baker grabbed the top, and the two carried Chaudhry "hammock style" into the garage and placed him on some padding which Newgent had placed on the floor. Tr. p. 1054. Newgent also cleaned up some additional blood.

After transporting Chaudhry to the garage, Newgent left the motel in Chaudhry's car and drove to Lake City Bank in an effort to withdraw money out of Chaudhry's bank account with his ATM card. A short time later, Newgent returned to the motel and went upstairs to Baker's apartment, where she slept for the night.

The next morning, Newgent went downstairs to the garage, where she found Baker sleeping on a mattress beside Chaudhry, who remained on the garage floor where she and Baker had placed him. Over the course of the morning, Newgent observed Baker demand that Chaudhry write him checks in return for what Baker promised would be a call for an ambulance, food, and Chaudhry's release. Chaudhry ultimately wrote two checks to Baker in the amounts of $500 and $5000. Newgent observed that some of the duct tape around Chaudhry's wrists had been cut,

presumably to permit him to write the checks.

After Chaudhry wrote these checks, Newgent observed Baker hit Chaudhry in the head again with the hammer. Newgent then saw Baker place a pillow over Chaudhry's face and hold it down. Newgent left the room and stood in the laundry room.

A short time later, Baker approached Newgent and sought her assistance in hiding Chaudhry's body. Baker cut the line to the water softening tank, which was located in the boiler room, and Newgent brought him a tool to assist him with removing the salt in the tank. Newgent and Baker transported the tank and its lid to the garage. Newgent anchored the tank while Baker placed Chaudhry's body inside the tank. Newgent helped place certain other items containing Chaudhry's blood inside the tank as well.

Having hidden Chaudhry's body, Baker and Newgent drove to Lake City Bank in Rochester and cashed the $500 check. The duo also drove to a National City Bank in Logansport to cash the $5000 check. Apparently National City Bank would not initially accept the check because Baker did not have two forms of identification. In search of a second form of identification, Baker and Newgent drove first to a courthouse and later to the health department, where Baker procured a birth certificate. Baker and Newgent returned to the National City Bank with the birth certificate. This time, the bank accepted the check. Baker gave Newgent some of the money and told her to place it under a bed.

Newgent, Baker, and others spent the next several days smoking crack at the Rose Dale Motel, where Chaudhry's body remained. During this time, Newgent went to her father's home to gather addi-

tional clothes to wear for her extended stay at the motel.

On October 27, 2005, authorities investigating Chaudhry's disappearance, including Rochester Police Officer Matt Campbell, spoke with Newgent, who ultimately indicated that Chaudhry's body was inside the motel. Chaudhry's cause of death was subsequently determined to be blunt force injuries to the head, as well as asphyxia due to strangulation and suffocation. According to pathologist Dr. Scott Wagner, Chaudhry had suffered approximately eight to nine blunt force injuries to the head, at least one of which had caused a fatal skull fracture and hemorrhaging.

On October 28, 2005, the State charged Newgent with Class B felony criminal confinement resulting in serious bodily injury (Count I), Class C felony assisting a criminal (Count II), and aiding in murder (Count III). Following a July 24–August 1, 2007 jury trial in which the jury found Newgent guilty as charged, the trial court entered judgment of conviction on each count and sentenced Newgent on September 27, 2007 to maximum consecutive sentences of twenty years for Count I, eight years for Count II, and sixty-five years for Count III, for an aggregate executed sentence of ninety-three years.

Newgent's original appeal, dated November 7, 2007, was dismissed as untimely, because it was not filed within thirty days of the September 27, 2007 sentencing order. On June 5, 2008, Newgent filed a motion for leave to file a belated appeal, which the trial court granted. This appeal follows.

## DISCUSSION AND DECISION

### I. Double Jeopardy

#### A. Counts I and III

##### 1. Actual Evidence Test

Newgent's first challenge is to her conviction for Count I, criminal confinement, which she claims violates double jeopardy principles. Specifically, Newgent argues that there was a reasonable possibility that the jury relied upon the same actual evidence in convicting her of both Counts I and III.

 Article I, Section 14 of the Indiana Constitution provides that "No person shall be put in jeopardy twice for the same offense." In *Richardson v. State*, 717 N.E.2d 32, 49 (Ind.1999), the Supreme Court developed a two-part test for Indiana double jeopardy claims, holding that

> two or more offenses are the "same offense" in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to *either* the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense.

(Emphasis in original). In articulating the "actual evidence test" as a method for evaluating double jeopardy claims, the *Richardson* court explained as follows:

> Under this inquiry, the actual evidence presented at trial is examined to determine whether each challenged offense was established by separate and distinct facts. To show that two challenged offenses constitute the "same offense" in a claim of double jeopardy, a defendant must demonstrate a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense.

717 N.E.2d at 53. The Supreme Court later expanded upon this analysis in *Spivey v. State*, 761 N.E.2d 831, 833 (Ind. 2002), as follows:

The test is *not* merely whether the evidentiary facts used to establish *one* of the essential elements of one offense may also have been used to establish *one* of the essential elements of a second challenged offense. In other words, under the *Richardson* actual evidence test, the Indiana Double Jeopardy Clause is not violated when the evidentiary facts establishing the essential elements of one offense also establish only one or even several, but not all, of the essential elements of a second offense.

(Emphasis in original). Application of the actual evidence test requires the court to " 'identify the essential elements of each of the challenged crimes and to evaluate the evidence from the [fact-finder's] perspective.' " *Lee v. State*, 892 N.E.2d 1231, 1234 (Ind.2008) (quoting *Spivey*, 761 N.E.2d at 832). In determining the facts used by the fact-finder to establish the elements of each offense, it is appropriate to consider the charging information, jury instructions, and arguments of counsel. *Id.; see Spivey*, 761 N.E.2d at 832.

The Indiana Supreme Court recently clarified the actual evidence test in *Lee* by holding that "[m]ultiple convictions do not violate Indiana's Double Jeopardy Clause if they logically could have been based on the same facts, but in light of the evidence, the instructions, the charges, and the argument of counsel, there is no reasonable possibility that the jury actually used exactly the same set of facts to establish both convictions." 892 N.E.2d at 1232. In *Lee*, the defendant was charged with burglary and attempted armed robbery as Class B felonies after he barged into the victim's home, pointed a gun at her, threatened her, and demanded money. 892 N.E.2d at 1234–35. Evidence establishing the burglary included the defendant's barging into the home, demanding money and possessing a gun. *Id.* at 1235, The charging information for the attempted armed rob-

bery specifically alleged the defendant's acts of (1) entering the victim's home, (2) displaying a gun, and (3) threatening the victim while demanding money. *Id.* at 1236. The Supreme Court acknowledged that if there was a reasonable possibility that the jury had used the fact of the defendant's barging into the residence—rather than his threats and demands—to establish the substantial step and mens rea elements of attempted armed robbery, the defendant's convictions for burglary and attempted armed robbery would be based on the same evidence and could not stand. *Id.* at 1235.

The *Lee* court concluded, however, that the defendant's convictions did not run afoul of the actual evidence test. In urging the jury to convict the defendant of attempted armed robbery, the prosecutor had emphasized the defendant's separate act of threatening the victim. 892 N.E.2d at 1236–37. Because the case involved a protracted criminal episode and the prosecutor had emphasized evidence distinct to each crime, the Supreme Court concluded as a practical matter that there was no reasonable possibility that the jury had relied upon the same evidence to support both crimes. *Id.* at 1236–37.

In reaching this holding in *Lee*, the Supreme Court distinguished cases where the record contained separate facts to support two convictions, but the case was presented in such a way as to leave a reasonable possibility that the jury had used the same facts to establish both. In evaluating how the evidence had been presented, the Supreme Court paid special attention to the charging information and jury instructions, the arguments of the prosecutor, and the relative impact of the evidence in question. *See id.* at 1235–37.

For example, in *Bradley v. State*, 867 N.E.2d 1282 (Ind.2007), cited by the *Lee*

court, the defendant was charged with confinement and aggravated battery following an episode in which he stabbed his wife, pinned her head over a toilet, and struck her head repeatedly with a hammer. As the *Lee* court observed, the jury could have found that the stabbing supported the aggravated battery, and the hammer injury supported the confinement. 892 N.E.2d at 1235. However, because the charging information for aggravated battery had alleged both the hammer injury and the stabbing, and because the hammer injury evidence was extensive and would have left a strong impression on the jury, the Court found a reasonable possibility that the jury may have used the hammer injury to support both charges, which the Court concluded violated double jeopardy. *See id.* at 1237 (citing *Bradley,* 867 N.E.2d at 1285).

Similarly, in *Guffey v. State,* 717 N.E.2d 103, 107 (Ind.1999), also cited by the *Lee* court, the defendant was charged with aiding in armed robbery and conspiracy to commit armed robbery, yet the specific facts alleged in the armed robbery information were also alleged to constitute the overt act in the conspiracy information. In spite of the presence at trial of facts demonstrating alternative overt acts in support of the conspiracy, the *Guffey* court concluded that, based upon the charging information and corresponding jury instructions, there was a reasonable possibility that the jury used the same facts to establish both counts. 717 N.E.2d at 106–07. *See also Lundberg v. State,* 728 N.E.2d 852, 855 (Ind.2000) (finding double jeopardy violation where jury was instructed that murder was the only overt act supporting conspiracy to commit murder, despite evidence of other overt acts), *cited in Lee,* 892 N.E.2d at 1235.

Having cited the above cases, the *Lee* court further clarified, however, that in cases where a single fact supports a first charge and is also included among additional alternative acts to support a second charge, the mere fact that both informations share this alleged fact does not necessarily indicate a reasonable possibility that the jury based its findings of guilt upon the same evidence. 892 N.E.2d at 1235–36. This is so especially in cases involving protracted criminal episodes. In *Redman v. State,* 743 N.E.2d 263 (Ind. 2001), the defendant was charged with confinement and conspiracy to commit murder after forcibly abducting the victim, confining her in an attic for several days, forcing her to engage in multiple sexual acts, and ultimately killing her and disposing of her body. *Id.* at 268. One of the overt acts alleged to establish the conspiracy charge was "abduction," which the defendant argued was the same act used to establish the confinement charge. *Id.* at 267. Although "abduction" was a specified act in the conspiracy information, the *Redman* court concluded that the possibility that the jury relied upon this fact to convict on both counts was "remote and speculative" in light of the protracted criminal episode at issue, the State's urging the jury to convict the defendant of conspiracy on a number of alternative grounds besides the abduction ground, and the court's instructions to this effect. *Id.* at 268.

With these cases as background, we now evaluate Newgent's challenge to her convictions for Counts I and III. Newgent was convicted in Counts I and III of Class B felony criminal confinement and murder, respectively. For the Class B criminal confinement conviction as charged in Count I, the State was required to establish that (1) Newgent (2) knowingly or intentionally (3) confined Chaudhry without his consent (4) and the confinement resulted in serious bodily injury to Chaudhry. For the murder conviction as it was charged in Count III, the State was re-

quired to establish that (1) Newgent (2) knowingly or intentionally (3) aided Baker (4) to kill Chaudhry (5) by providing him with a weapon and assisting him in binding and confining Chaudhry (6) which led to the killing of Chaudhry by Baker.

In urging the jury to convict Newgent of Count I, the State pointed to evidence at trial demonstrating that Newgent had provided Baker with a hammer, which Baker used to hit Chaudhry, while Baker held Chaudhry in a headlock; that Newgent had also provided Baker with duct tape, which he used to bind Chaudhry's hands and legs; that Newgent had physically moved Chaudhry to the garage; and that Newgent had supervised Chaudhry in Baker's absence, preventing Chaudhry's discovery. In arguing the existence of serious bodily injury, the State pointed to Chaudhry's death, one cause of which was a lethal blow by Baker using the hammer provided by Newgent.

In urging the jury to convict Newgent of Count III, the State pointed to all of the evidence supporting Count I. Indeed, the charging information and jury instructions for Count III specified only the acts of "providing [Baker] with a weapon and assist[ing] him [in] binding and confining [ ] Chaudhry," all of which the State had also argued supported Newgent's conviction for Count I. App. p. 15. Importantly, in support of Count III, the State again referred to Newgent's act of providing the hammer to Baker, and Baker's use of the hammer to inflict lethal injuries to Chaudhry.

In applying the actual evidence test to the instant case, we must observe that, like in *Guffey,* the facts alleged in the charging information used to establish the "aiding" element in Count III were the very facts already used to establish Count I. Moreover, the evidence of the confinement in Count I included Newgent's active involvement in giving Baker a hammer, which was also the only physical act by Newgent directly leading to Chaudhry's death. Even given the other evidence suggesting Newgent's complicity in the events at issue, her act of providing the hammer, as in *Bradley,* likely had a significant impact, especially in light of the prosecutor's emphasis, with respect to Count III, that the hammer injuries were fatal. In addition, unlike in *Lee,* the State failed to emphasize evidence distinct to each crime or, as in *Redman,* to provide alternative acts, exclusive of those charged in Count I, upon which the jury could base its verdict in Count III. Accordingly, we reluctantly conclude that this case was presented in such a way that there was a reasonable possibility that the jury relied upon the same evidence to support both charges.

Of course, the State also alleged additional evidence in support of Count III, including Newgent's presence at the scene at the time Baker suffocated and strangled Chaudhry, her failure to oppose Baker, her efforts to hide Chaudhry's body and clean up the scene, her joint efforts to cash Chaudhry's checks, and her "partying" at the hotel—with drugs purchased with Chaudhry's money—for days following Chaudhry's death. Yet none of these acts was included in those acts specifically alleged in the information for Count III. Even if the jury had sought to convict based upon this additional evidence, the only "acts" directly connected to Chaudhry's murder were Newgent's presence when Baker strangled and suffocated Chaudhry and her failure to oppose these acts. But the jury was plainly instructed that these "acts" alone were inadequate to prove aiding another in a crime as required by Count III. In any event, because the question at issue is merely whether there was a reasonable possibility that the jury may have considered the same evidence in establishing Counts I and III, the

possibility that they may have considered different evidence does not alter that outcome. *See Bradley,* 867 N.E.2d at 1284 (observing that the proper inquiry in not whether there is a reasonable probability that the jury used different facts to convict a defendant of two counts, but whether it is reasonably possible the jury used the same facts).

### 2. Justice Sullivan's Category 3

Because the actual evidence test is subject to some interpretation, however, we find it helpful to consider Newgent's challenge under an alternative double jeopardy analysis. As the Supreme Court recognized in *Guyton v. State,* 771 N.E.2d 1141, 1143 (Ind.2002), the two-part *Richardson* test is not the exclusive measure of double jeopardy violations. As enumerated in Justice Sullivan's concurrence in *Richardson* and seemingly adopted in *Guyton,* five additional categories of double jeopardy exist:

—(1) "Conviction and punishment for a crime which is a lesser-included offense of another crime for which the defendant has been convicted and punished";

—(2) "Conviction and punishment for a crime which consists of the very same act as another crime for which the defendant has been convicted and punished";

—(3) "Conviction and punishment for a crime which consists of the very same act as an element of another crime for which the defendant has been convicted and punished";

—(4) "Conviction and punishment for an enhancement of a crime where the enhancement is imposed for the very same behavior or harm as another crime for which the defendant has been convicted and punished"; and

—(5) "Conviction and punishment for the crime of conspiracy where the overt act that constitutes an element of the conspiracy charge is the very same act as another crime for which the defendant has been convicted and punished." *Richardson,* 717 N.E.2d at 55–56 (Sullivan, J., concurring), *cited in Guyton,* 771 N.E.2d at 1143.

Category 3, above, suggests that Newgent may not be convicted and punished for Count I if Count I consists of an act which constitutes an element of Count III. In evaluating the instant case under Category 3, above, we are guided by Justice Boehm, who proposed in his concurring opinion in *Guyton* that courts consider the statutes, charging instruments, evidence, and arguments of counsel in order to determine whether the facts establishing one crime are the same as the facts establishing one or more elements of another. 771 N.E.2d at 1154 (Boehm, J., concurring).

∎ Here, not only does the charging information for Count III specifically allege, as the "aiding" element, the very confinement act which was charged in Count I, but the evidence presented and argued at trial to establish this "aiding" element in Count III also included all of the evidence used to establish Count I, both the specific "provid[ing] ... a weapon" which Baker used to inflict Chaudhry's fatal head injury and "assist[ance] [with] binding and confining" as alleged in the information, as well as the facts of moving the victim and staying with him to prevent his discovery. Indeed, it was the State's position that the confinement of Chaudhry was coterminous with the events leading to his murder, all of which the State alleged Newgent knew of, and which served as the basis for her murder charge in Count III. As the State claimed in closing argument, "[Chaudhry] was confined from the minute the assault took place until the moment of his death...." Tr. p. 1255. Upon appeal, the State does not dispute that "the information, the jury instructions, and the pros-

ecutor's comments do not separate the evidence." Appellee's Br. p. 11.

Given the charging information for Count III, which listed as the alleged acts the very same acts which the State alleged supported Newgent's conviction in Count I, and the State's use of the very same evidence to establish both Count I, and at the very least, the "aiding" element of Count III, we must conclude that Newgent's convictions for Counts I and III also violate double jeopardy under Category 3. The State suggests that the appropriate remedy is to reduce Newgent's conviction in Count I to a Class D felony. Given the charging information for murder, which specifies the acts of providing a weapon and assisting in binding and confining, which similarly establish Class D felony confinement, we are unconvinced that a Class D felony criminal confinement conviction would survive a similar double jeopardy challenge. We therefore cannot accept the State's proposed remedy of reducing the confinement conviction to a Class D felony. Accordingly, having concluded, based upon both the actual evidence test and Category 3, that Newgent's convictions for Counts I and III violate double jeopardy, we remand to the trial court to vacate her conviction and sentence for criminal confinement under Count I. *See Richardson,* 717 N.E.2d at 54–55 (indicating that when convictions violate double jeopardy principles, it is proper to vacate the conviction with the less severe penal consequences).

### B. Counts II and III

Newgent also argues that, given her conviction in Count III for murder, her conviction for Count II, assisting a criminal, similarly violates double jeopardy. As Newgent points out and the State acknowledges, the Indiana Supreme Court has observed that the crime of assisting a criminal was intended to apply to a person who did not actively participate in the crime itself, but rather assisted a criminal after the fact. *See Smith v. State,* 429 N.E.2d 956, 959 (Ind.1982), *overruled on other grounds by Wright v. State,* 690 N.E.2d 1098, 1109 (Ind.1997); *see Hauk v. State,* 729 N.E.2d 994, 999 (Ind.2000). The State nevertheless urges this court to uphold Newgent's conviction for assisting a criminal by highlighting all of the acts she committed after Chaudhry's death and suggesting that these constituted a separate crime. Among these acts were Newgent's efforts to hide Chaudhry's body, clean up the scene, wash Baker's clothing, and hide Chaudhry's money.

In evaluating the parties' arguments on these points, we are presented with something of a conundrum. Based upon the charging information and the evidence demonstrating that Chaudhry received a fatal wound from the hammer, we have found a reasonable possibility that the jury based Newgent's murder conviction on the "confinement" evidence, none of which included the acts allegedly supporting her conviction for assisting a criminal in Count II. Yet a simple evaluation of the evidence at trial and the prosecutor's arguments also support the alternative theory that Newgent's murder conviction was based upon her conduct before, during, and after the crime, including the acts constituting Count II. Given this record, it is difficult to conclude that Count II constituted an offense separate and apart from Newgent's and Baker's common murder scheme.

The State points to *Harris v. State,* 617 N.E.2d 912, 915 (Ind.1993), *overruled on other grounds by Wright,* 690 N.E.2d at 1109, wherein the Indiana Supreme Court acknowledged that, "It is entirely possible for a person to be guilty of assisting a criminal under circumstances which are not inherently included in the offense of murder." Yet the case the Harris court

cites for this proposition addresses the question in the context of whether a defendant is entitled to a lesser-included-offense instruction. *See Reynolds v. State,* 460 N.E.2d 506, 509–10 (Ind.1984). In cases, including *Harris,* where this issue has been raised in the context of the permissibility of multiple convictions, both this court and the Indiana Supreme Court have vacated convictions for assisting a criminal where it appeared that the defendants were active participants in the crimes for which they were convicted and their "assisting" convictions were merely efforts to protect or further those schemes. *See Harris,* 617 N.E.2d at 915–16; *Smith,* 429 N.E.2d at 959; *Kelly v. State,* 813 N.E.2d 1179, 1185 (Ind.Ct.App.2004), *trans. denied.*

Notwithstanding the reasonable possibility that the jury did not consider these acts to be part of the murder scheme, we must conclude from this record that Newgent's conviction for Count II should be vacated pursuant to the *Smith* principle. Notably, the State's charge of assisting a criminal in Count II was based upon Newgent's efforts to assist Baker in avoiding punishment for Chaudhry's murder. Yet, as demonstrated by Count III, Newgent was convicted as an active participant in this very murder. Evidence supporting Newgent's conviction for Count II included the facts that she cleaned up Chaudhry's blood, hid his body and other evidence in the tank, and washed Baker's clothing. But the State drew upon this same evidence, and, *inter alia,* the fact that Newgent safeguarded the money Baker acquired from Chaudhry, in claiming that Newgent committed aiding in murder. Because Newgent actively participated in Chaudhry's murder and, as the prosecutor alleged and this record supports, her actions thereafter were largely in continuation of Baker's and her murder scheme,

she cannot be convicted of both murder and assisting a criminal. *See Kelly,* 813 N.E.2d at 1185 (citing *Smith* principle in overturning defendant's conviction for assisting a criminal on basis that the cover-up activity at issue was continuation of common scheme or plan of her felony murder conviction). Accordingly, we remand to the trial court with instructions to vacate Newgent's conviction for assisting a criminal. *See Richardson,* 717 N.E.2d at 54.

## II. Appropriateness of Sentence

Newgent also challenges the appropriateness of her sentence. Having vacated her convictions for Counts I and II, we need only evaluate her sixty-five-year sentence for Count III, murder. Under Indiana Code section 35–50–2–3 (2005), a person who commits murder shall be imprisoned for a fixed term of between forty-five and sixty-five years, with the advisory sentence being fifty-five years.

Article VII, Sections 4 and 6 of the Indiana Constitution " 'authorize[ ] independent appellate review and revision of a sentence imposed by the trial court.' " *Anglemyer v. State,* 868 N.E.2d 482, 491 (Ind.2007) (quoting *Childress v. State,* 848 N.E.2d 1073, 1080 (Ind.2006) (emphasis and internal quotations omitted)). Such appellate authority is implemented through Indiana Appellate Rule 7(B), which provides that the "Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." We exercise deference to a trial court's sentencing decision, both because Rule 7(B) requires that we give "due consideration" to that decision and because we recognize the unique perspective a trial court has when making sentencing deci-

sions. *Stewart v. State,* 866 N.E.2d. 858, 866 (Ind.Ct.App.2007). It is the defendant's burden to demonstrate that his sentence is inappropriate. *Childress,* 848 N.E.2d at 1080.

In contesting her sentence, Newgent argues that Baker was the true "mastermind and perpetrator" of Chaudhry's murder. Appellant's Br. p. 14. She further points out, with respect to her character, that her criminal history involves only two juvenile adjudications, which she claims do not reflect poorly enough upon her character to justify a maximum sentence.

■ We can say without hesitation that the extraordinary brutality of this crime warrants Newgent's maximum sixty-five-year sentence. Newgent may not have inflicted the final death blow, but her actions and inaction during this extended and torturous crime are among the worst of the worst. When Baker held the elderly Chaudhry—who had been charitable enough to employ him—in a headlock, Newgent brought him a hammer. When Baker violently beat Chaudhry over the head enough times to incapacitate him—and cause other motel residents to call for emergency assistance—Newgent brought him duct tape. When a police officer who could have rendered assistance arrived on the scene, Newgent stood watch over Chaudhry and kept her silence.

Newgent carried the beaten Chaudhry into the garage, and she placed him on the garage floor. As Chaudhry lay in the garage, she took his car and credit cards and drove to an ATM machine to try her hand at stealing his money. When she returned, she retired for bed for the night, fully aware that Chaudhry lay *in extremis,* on the garage floor, at Baker's mercy. When Newgent awoke the next morning, she found Baker forcing Chaudhry to write him checks, apparently because Baker, remarkably, was unwilling to forge them. Yet Newgent refused to intervene or provide any aid, and she simply stepped out of the room as Baker strangled and suffocated Chaudhry. After Chaudhry's murder, Newgent stuffed his body and other incriminating evidence into a water softening tank, and she accompanied Baker to at least two banks, a courthouse, and the health department in order to cash Chaudhry's checks. Newgent then enjoyed "partying" at the motel for several days and smoking crack purchased with Chaudhry's money, as Chaudhry's broken body lay where she had left it, stuffed in a nearby water softening tank. Indeed, this lifestyle proved so favorable to Newgent that she drove herself home to pack additional clothes in order to spend more time at the motel with Baker and friends. The level of depravity exhibited by Newgent's conduct can only be answered with a maximum sentence. We conclude that Newgent's sixty-five-year sentence is appropriate. Indeed, but for double jeopardy principles dictating the vacation of Newgent's convictions in Counts I and II, her aggregate ninety-three-year sentence, based upon these facts, would have been appropriate as well.

Having concluded that Newgent's convictions for Counts I and II as charged and prosecuted in this case violate double jeopardy principles, we remand to the trial court with instructions to vacate those convictions and their corresponding sentences. We further conclude that Newgent's sixty-five-year sentence for murder is appropriate.

The judgment of the trial court is affirmed in part and reversed in part, and the cause is remanded with instructions.

RILEY, J., and BAILEY, J., concur.