## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 18 2019, 8:19 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Alexander W. Robbins
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jeremy J. Haug,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

October 18, 2019

Court of Appeals Case No.
19A-CR-642

Appeal from the Morgan Superior
Court

The Honorable Sara A. Dungan,
Judge

Trial Court Cause No.
55D03-1809-MR-1526

**Brown, Judge.**

[1] Jeremy J. Haug appeals his convictions for murder, criminal confinement as a level 3 felony, and aggravated battery as a level 3 felony. He raises three issues which we consolidate and restate as:

I.    Whether the trial court's decision to allow him to represent himself was clearly erroneous; and

II.   Whether his sentence violates double jeopardy.

We affirm in part, reverse in part, and remand.

### Facts and Procedural History

[2] Jeremy Haug lived in the same trailer park as Chad Walden and his partner Trina Miller. Haug and Walden were friends and Haug "was like [Walden's] brother." Transcript Volume III at 64. On September 7, 2018, Haug went to Walden's residence, and Miller made him some food. Haug ate and at some point said, "you think I'm rich, bitch, I'm f------ broke. I'm f------ broke." *Id.* at 75. His voice became louder and louder. Walden slammed his hands down on the table and told Haug to lower his voice and that enough was enough. Haug left four or five different times and returned with beer.

[3] At some point, Miller went to the bathroom, heard a "really loud bang," returned to the room, and saw Haug with his arms wrapped around Walden's throat while Walden was on his knees fighting to bring himself back up. *Id.* at 82. Haug screamed, "you think I'm weak, mother f-----, I'm going to show you weak." *Id.* Walden "couldn't break free." *Id.* at 83. Miller grabbed a baseball bat, screamed at Haug, told him to quit choking Walden, and hit the bat on the

floor. Haug continued to choke Walden and turned and looked at Miller, and Miller was scared by his expression and left to obtain help.[1]

[4] Miller returned in "about a minute and a half, two minutes" to find Haug choking Walden who was still on his knees. *Id.* at 88. She heard a pop sound, and Haug continued to choke Walden. Walden's body went limp, and Haug finally let go of him and his face hit the floor. Haug screamed "goddamn it, f---," slammed down his beer, and walked out the door. *Id.* at 93. Miller could not feel a pulse on Walden's neck, observed that his neck was purplish black, and called 911. Walden died as a result of asphyxia due to manual strangulation and neck compression. After his arrest, Haug yelled: "I told you I would get you, whoop your ass." *Id.* at 118.

[5] In a police interview, Haug stated that Walden threw a bottle at him and placed him into a chokehold, but he was a wrestler and spun Walden around. He also stated that he had a complex about losing, could not handle losing, and was not in fear of his life but just in fear of being put to sleep. After being told that Walden was dead, Haug stated that Walden tried to kill him.

[6] On September 10, 2018, the State charged Haug with murder. The next day, the court held a hearing at which Haug indicated that he could read and understand English, had some college, was not under the influence of drugs,

---

[1] Miller testified that Haug's "eyes were like this big around I mean he was like . . . he had this rage on his face, and everything. And I've been around him for ten years, I ain't never seen that look, never." Transcript Volume III at 87.

alcohol, or anything else that would affect his understanding of the proceedings, and was working at Nice Pak before his arrest and earned $14.30 an hour. He also requested an attorney. The court appointed Allen Lidy, a public defender, and Attorney Lidy filed an appearance.

[7] On October 4, 2018, the State filed a motion to amend information to add charges of Count II, criminal confinement as a level 3 felony, and Count III, aggravated battery as a level 3 felony.[2] On October 10, 2018, the court held a hearing and informed Haug of the new charges. Haug indicated that he understood the nature of the charges against him and did not have any questions.

[8] On November 27, 2018, Haug wrote a letter to the court requesting to proceed pro se. Specifically, the letter stated:

> After doing some soul searching I have gained some understanding about law and would like to retract the oath that places me under law. And would like to proceed Prose [sic]. Thus for placing me above law. And being led in the Spirit I will be representing Love.

Appellant's Appendix Volume II at 23.

---

[2] Count II, criminal confinement, alleged that Haug "did knowingly confine another person, to wit: Chad E. Walden without the consent of Chad E. Walden, resulting in serious bodily injury to Chad E. Walden." Appellant's Appendix Volume II at 20. Count III, aggravated battery, alleged that Haug "did knowingly inflict injury on another person, to wit: Chad E. Walden that creates a substantial risk of death, or causes protracted loss or impairment of the function of a bodily member or organ." *Id.*

On December 10, 2018, the court held a hearing on the motion. Haug indicated that he did not take oaths but would tell the truth and indicated he wished to represent himself. The court stated that the State would be represented by a lawyer and that, "unless you are trained in the law, or have certain legal experience, you will be at a disadvantage at trial." Transcript Volume II at 15. Upon questioning by the court, Haug indicated that he understood that he had the right to be appointed an attorney to represent him at no cost. The court informed him that self-representation is almost always unwise and may result in conducting a defense which is to his detriment or disadvantage, and Haug indicated that he understood. The court informed him that an attorney would have certain skills and expertise in preparing and presenting a proper defense, and he indicated he understood and still wished to proceed pro se. The court stated: "Okay. I haven't talked you out of it yet. Do you understand if I were in any sort of legal trouble, and had a legal case, I would hire an attorney myself, do you understand that?" *Id.* at 16. Haug answered: "I do." *Id.* Haug indicated that he went through the twelfth grade and received his GED.

The following exchange occurred between the court and Haug:

> Q. In your letter you stated you gained some understanding about law.
>
> A. I am fulfillment of law, I'm representing myself.
>
> Q. I'm sorry, what?
>
> A. I'm fulfillment of law.

Q. Okay.

A. Law being love, that's what I know about. I'm full of love. Absolutely.

Q. Okay. Well, sir, for legal procedures and what's going to be going on . . .

A. Legal, I have no knowledge whatsoever.

Q. Okay. And I have to ask this as well. Are you or have you ever been treated for any mental illness?

A. No ma'am.

*Id.* at 17. Haug indicated he still wished to represent himself and that he understood the charges.

Upon questioning by the prosecutor, Haug stated: "I realize the smartest move for me to make is to follow my Lord and Savior." *Id.* at 18. Haug indicated that he did not suffer from any mental illness and had a head injury twenty-one years ago when he "was supposedly ran over by a car." *Id.* at 21. He indicated that he completed rehab for the head injury, subsequently received his GED, and that the head injury does not affect his ability to speak, listen, read, write, or communicate. He testified that he saw a doctor since his head injury and answered in the negative when asked if that doctor ever found anything that troubled them about his cognitive ability. He indicated that he had never received disability because of the head injury. He stated that he had a stroke in 2001 but had no cognitive problems or functional deficits because of the stroke. The prosecutor asked Haug if he thought that an evaluation for competency to

stand trial would be prudent in his case and referenced the head injury and the stroke, and he answered: "I'm fine. I'm fine." *Id.* at 25. He stated that those things happened years ago and he had been raising a teenage daughter since then.

[12] He stated that he was representing himself because that was what he was supposed to do. The prosecutor stated, "If I was going to look in my Bible, where would I find . . . ," and Haug answered: "I'd say read Romans." *Id.* at 26. When asked if there was anything the prosecutor could ask or suggest or tell him that would change his mind, he answered: "No sir." *Id.* at 27.

[13] When asked if he had any questions, Attorney Lidy stated:

> It would just be largely cumulative, Judge. I would note for the record that I did spend a considerable amount of time with Mr. Haug last Monday, I think it was . . . and we went over much of the things that Your Honor and [the prosecutor] went over in private, and the answers he gave today are largely consistent with the answers that he provided me during our consultation, during our meeting. We've had several. I've never had . . . with respect to competency, as an officer of the court, I've never questioned . . . . I don't necessarily agree with Mr. Haug's decision making on this as his lawyer, as a appointed counsel, as an officer of the Court, but I've never questioned his competency and his ability to understand what we're doing. I've always been able to freely communicate with Mr. Haug, and . . . we've had no trouble understanding one another from my perspective. From a competency standpoint, I think the . . . anyway, my point is is that in our conference last Monday he gave similar answers and reasonings as he has provided to Your Honor today and [the prosecutor's] questions. So, largely anything I would ask him

would be cumulative of the questions already asked and
answered.

*Id.* at 27-28.

[14] The court stated "I've think we've all kind of tried to talk him out of this" and asked Attorney Lidy if he saw a benefit in standby counsel who answered: "I think that's fraught with potential problems, Judge." *Id.* at 28. After further discussion, the court stated that it found Haug was able to represent himself. The court's order found that Haug knowingly and voluntarily waived counsel and released Attorney Lidy.

[15] On January 14, 2019, the court held a pretrial hearing. Haug indicated that he still wished to represent himself and rejected a plea offer from the State. The court and the parties discussed discovery and the trial. The prosecutor stated that he "would anticipate a State made Motion in Limine that he be allowed to only testify from the witness stand, not in any questioning, or other witnesses . . . ." *Id.* at 45. Haug objected. The prosecutor explained that Haug could not testify in his argument, and he replied: "Okay. Yes." *Id.* at 46. When asked if thirty minutes for an opening statement would be okay with him, Haug answered: "Sounds fair to me." *Id.* at 48. On January 22, 2019, the court held a status hearing. The court and Haug discussed the trial and discovery.

[16] On January 31, 2019, the State filed a Notice of Potential Competency and/or Sanity Concerns asking the court to hold a hearing to ensure that Haug was competent to stand trial and there were no issues with his sanity. It asserted

that Haug made phone calls from jail to family members and "made comments about the Prosecutor and his role that could suggest that [Haug] is delusional or has some physical or mental impairment that affects his perception of the Court system and that could affect his ability to function as his own attorney." Appellant's Appendix Volume II at 26. The notice also stated: "On the other hand, these comments could simply be figure of speech references or comments made to pass idle time that do not indicate any cognitive impairment." *Id.*

On February 7, 2019, the court held a competency hearing. Haug indicated he had received a copy of the State's notice. The court played some of the jail phone calls, in which the following exchange occurred during a phone call between Haug and his mother:

> MR. HAUG: And the Sonnega guy right there, that prosecutor, very, very, very, very, very very (inaudible) evil guy. Very evil. If you look hard enough, and you see his spirit, he looks like Medusa. His whole body is full of really (inaudible), his whole body, that's his spirit (inaudible)
>
> MOTHER: Yeah.
>
> MR. HAUG: I can't believe you can't see it, I can see it almost plain as day. But, you know, it's . . .
>
> MOTHER: Okay.
>
> MR. HAUG: It's all right.
>
> MOTHER: All right, baby.

Transcript Volume II at 64. The following exchange then occurred:

THE COURT: . . . . Mr. Haug, were you able to hear the tape?

MR. HAUG: Oh, absolutely. Ma'am, I remember the phone conversation. This is my mother. She was crying. She was so worked up and crying. I love my mother. I love . . . that's . . . I want to console my mom. But I can't. I can do it through phone conversation, try to attain . . . calm her down, to give her some peace, and was all my intentions.

THE COURT: Okay.

MR. HAUG: And that's all. Nothing more.

THE COURT: All right. Well do you understand he's pointed out specifically a part in the jail phone call where . . .

MR. HAUG: Oh yes. Oh yes.

THE COURT: . . . you're talking about him and . . .

MR. HAUG: Oh absolutely.

THE COURT: Okay.

MR. HAUG: I . . .

THE COURT: All right, do you want to explain further, or . . . ?

MR. HAUG: I believe I've explained well enough, ma'am. I was with my mother. And to bring her peace, what one feels versus what another's opinion.

THE COURT: Okay. All right. Well, do you still wish to represent yourself . . . ?

MR. HAUG: I believe to be sane, I believe very much so to be sane.

THE COURT: Okay.

MR. HAUG:  If I believed the doctor, I wouldn't be here, I wouldn't be able to walk or talk if I believed the doctor.  But, you know, and that head trauma was '97, December of '97.  Many years ago.

THE COURT:  Okay.

MR. HAUG:  I believe I am rather close to normal.  I mean . . .

THE COURT:  Well we've gone through this several times.  And I, like I said, do you still wish to represent yourself?

MR. HAUG:  I . . . yes, I do ma'am.

*Id.* at 65-66.

[18]     The court stated in part:

I think based on what I've heard, and again I'll listen to that whole CD on your behalf, Mr. Haug, but, Mr. Haug has always intelligently answered my questions.  Mr. Lidy never raised any concerns when he was representing Mr. Haug.  In fact, when he left, he said there hadn't been any problems.  I've gone through your Dowell rights.  We've talked about all of these other issues.  We had a pretty extensive hearing about you representing yourself.  So, I'm going to allow that to continue.  However, and I've thought about this from the very beginning, when we let you start representing yourself, I've been thinking about stand by counsel.  And I am going to appoint a stand by counsel.

*Id.* at 67.

[19]     On February 11, 12, 13, and 14, 2019, the court held a jury trial with stand by counsel present.  At one point during jury selection, Haug stated: "Make sure you make that clear to everyone.  I'm not under oath.  I . . . tell all truth, in full

truth . . . ." *Id.* at 155. He later stated: "I feel it'd be smart enough for me to say, because I'm going pro se, by no means being under oath, by no means am I trying to say that I would not be completely truthful. That I will just through my religious beliefs I will not be under oath." *Id.* at 165.

[20] Miller testified in part that she never saw Walden in control of or on top of Haug and that it was "all one sided." Transcript Volume III at 91. After the court excused the jury on the third day, the court discussed the instructions with the parties. The court asked Haug if he had an opportunity to look at one of the State's tendered instructions, and he responded affirmatively. The following exchange then occurred:

> MR. HAUG: . . . I understand what going pro se is. That is my total, entire intentions. We are trying to inform everyone in the masses to do so. We're trying to wake up the public.
>
> THE COURT: Okay.
>
> MR. HAUG: So that is a mission. And I do know what I'm doing. I did intentionally go pro se. This is all my own choice. This is all my own will. So whatever comes of it, is all of my own fault.
>
> THE COURT: Okay.
>
> MR. HAUG: And that's fine.
>
> THE COURT: Okay, well the question is right now before me is whether or not I should include this in the final instructions that I give to the jury after we give them the case. So, do you object to the Court giving this instruction, do you have something different you want me to say, or . . . do you want me to strike it entirely I guess is my question for you right now.

> MR. HAUG: I don't see why it makes a difference. Yeah, they can . . . I mean, whatever. It really doesn't matter.

Transcript Volume IV at 30-31. Haug later asked if the court could enter definitions of "prosaic . . . as well as mosaic" into evidence. *Id.* at 31. The court stated that admitting something into evidence is different from reading it as a final instruction. Haug responded: "Right. I just want it to be there for them to look at so they can make their own judgment call on, hey this dude's going pro se" and "[s]o if they think I'm crazy or whatever, that's all fine and well too." *Id.* at 32. The court and Haug engaged in a discussion regarding the difference between prosaic and pro se. The court asked Haug if he was withdrawing the instruction of mosaic, and Haug replied: "If you're so scared to put definitions so that people would not be confused, so they would be easy for them to understand." *Id.* at 46. The court indicated that it has to be a relevant definition, and Haug stated: "I want every single one of them that you can put in there, I want the whole book you have in hand, please, as evidence." *Id.* The court stated: "I don't have a book in my hand, if you want to be smart. Okay?" *Id.* Haug later stated: "It's mosaic law. It doesn't have the law part in there, but it's patchwork. It's the defense, they are patchwork. They're not true witnesses, they patch their stuff together." *Id.* He later stated: "You don't have to put it in there. No big deal. No big deal." *Id.*

[21] During closing argument, the prosecutor stated that "at all times [Haug] was always in control" and "was always in a superior position," and that Haug did not stop and he strangled Walden. *Id.* at 125. He also argued:

We believe . . . beyond a reasonable doubt that murder has been proven. Now, you've also got two other charges to consider. And when you look at confinement, we could say that confinement happened either the first time or the second time. [Walden] was not there by his own consent. [Walden] was fighting, but not putting up much of a fight. But we really only charged one confinement, and probably the most serious one is here. I think initially when something happens, there's mutual combat, right? You're pushing, you're shoving. We'll give the defendant least no charge for that. We don't know what happened. But by the time that had gone on, when [Miller] had the ball bat, and you know, he, the defendant, was in control, the second time we believe is where the confinement happened. Please continue a couple of slides, go . . . then lastly is serious bodily injury. Dr. Smock explained what serious bodily injury was. And when you are there, with your arm around somebody's neck, stopping the blood flow either up or down, and both sides are dangerous, as we learned, too much blood going up and can't come down is what caused really [Walden's] death. There is no doubt there's serious bodily injury. And then the next count, aggravated battery, again, we know it was the defendant, was he aware of a high probability he was injuring [Walden]? He was right there up close and personal. Next slide, [Walden] had injury. If you look at [Walden's] neck, you saw the muscle, the hemorrhaging, the trauma, that was injury. And was there a risk of death? A substantial risk of death? You betcha. Loss of blood to the brain creates a substantial risk of death.

Id. at 131-132. The jury found Haug guilty as charged.

[22] On March 7, 2019, the court held a sentencing hearing. The prosecutor stated: "I think the State will concede that aggravated battery and murder merge. So,

from the State's perspective there's no need to sentence separately on counts one and count three." *Id.* at 159.

[23] The court stated: "We'll be entering convictions according to the verdict of the jurors. Count one, murder, count two criminal confinement resulting in serious bodily injury, count three, aggravated battery causing substantial risk of death, creating substantial risk of death or causing protracted loss of impairment of function of a bodily member or organ." *Id.* at 161. The court also stated: "I'm going to find counts one and three will merge. And I'm going to make a finding that based on the aggravating circumstances in this case that count one and three together should be consecutive. Or count two should be consecutive to those." *Id.* It later stated: "I am going to put out sentence as follows: On counts one and three that merge, I'm going to order a sentence of sixty-five years, in Department of Corrections. That will be consecutive to count two. A sentence of nine years. So seventy-four years total in the Department of Corrections." *Id.* at 162. The court's order titled "JUDGMENT AND ORDER RE: SENTENCING" states in part:

> On March 07, 2019, The Court having conducted a sentencing hearing this date and having considered evidence presented by the State and Defendant, the Court enters Judgment that the Defendant is guilty of the offense of:
>
> Count 1: 35-42-1-1(1): Murder;
>
> Count 2: 35-42-3-3(a)/F3: Criminal Confinement . . . resulting in serious bodily injury[];

Count 3: [3]5-42-2-1.5/F3: Aggravated Battery knowingly inflict injury that creates a substantial risk of death

\* \* \* \* \*

SENTENCE: The Defendant is sentenced to imprisonment in the Indiana Department of Correction for a period of 65 Year(s) for counts 1 and 3; 9 Year(s) for count 2, with jail time credit 180 days (plus Class B Credit) actually served prior to sentencing.

> X   The Sentence for counts 1 and 3 shall be merged. The Sentence for count 2 shall be served consecutively to counts 1 and 3.

Appellant's Appendix Volume II at 107.

### *Discussion*

### I.

[24]   The first issue is whether the trial court's decision to allow Haug to represent himself was clearly erroneous. Haug acknowledges that the court adequately advised him of the dangers of self-representation and the benefits of counsel and repeatedly asked him to verify that he wished to continue representing himself. He also "does not contend that the trial court failed to advise him of his *Dowell* rights . . . ."[3] Appellant's Brief at 31. While he states that the trial court held

---

[3] Haug cites *Dowell v. State*, which held in part that, to establish a knowing, intelligent, and voluntary waiver of a defendant's right to counsel, trial courts should use the following guidelines:

> The defendant should know of the nature of the charges against him, the possibility that there may be lesser included offenses within these charges, and the possibility of defenses and mitigating circumstances surrounding the charges. The defendant should be aware that self-representation is almost always unwise, that the defendant may conduct a defense which is to his own detriment, that the defendant will receive no special indulgence from

"what it deemed to be a 'competency hearing,'" he argues that the hearing could not be considered a competency hearing. *Id.* at 20. Haug argues that the trial court erred by failing to order a competency evaluation and hearing to determine if he was sufficiently competent to represent himself at trial. He points to his November letter to the court, the State's Notice of Potential Competency and/or Sanity Concerns, his comment regarding Medusa during the jail phone call, and his comment that if he believed the doctor he would not be there and would not be able to walk or talk. He asserts that there is not a complete or sufficient record for this Court to make a determination as to whether he was competent to represent himself at trial. He argues that the only relief available is to remand the case for the purposes of conducting a *nunc pro tunc* competency hearing. He contends that, "[g]iven the colloquy at the end of the third day of trial, the trial court should have reconsidered its position in

---

the court and will have to abide by the same standards as an attorney as to the law and procedure, and that the State will be represented by experienced professional legal counsel.

Specifically, the defendant should be instructed that an attorney has skills and expertise in preparing for and presenting a proper defense not possessed by the defendant. These include, among other things: (1) investigating and interrogating witnesses; (2) gathering appropriate documentary evidence; (3) obtaining favorable defense witnesses; (4) preparing and filing pre-trial motions; (5) preparing appropriate written instructions for the jury; (6) presenting favorable opening and closing statements; (7) examining and cross-examining witnesses at trial; and (8) recognizing objectionable, prejudicial evidence and testimony and making proper objections thereto.

Finally, the trial court should inquire into the educational background of the defendant, the defendant's familiarity with legal procedures and rules of evidence, and additionally, into the defendant's mental capacity if there is any question as to the defendant's mental state. If the defendant chooses to proceed *pro se*, he should realize he cannot later claim inadequate representation.

*Dowell v. State*, 557 N.E.2d 1063, 1066-1067 (Ind. Ct. App. 1990), *trans. denied*, *cert. denied*, 502 U.S. 861, 112 S. Ct. 181 (1991).

believing that [he] intelligently waived the right to counsel and should have directed standby counsel to take over the case." *Id.* at 30. He also asserts that the presentence investigation report ("PSI") indicates that he was evaluated in 2016 or 2017 in a CHINS matter.[4]

[25] The State argues that a court has no obligation to evaluate competency for self-representation or to apply a heightened level of competency to that decision when a defendant's competency to stand trial is not challenged. It asserts that the State's Notice of Potential Competency and/or Sanity Concerns was brought to the court's attention out of an abundance of caution and to prevent any appellate claim that the information should have been disclosed instead of out of a true belief that the call showed Haug to be incompetent. It argues that "[s]aying that you can see someone's evil spirit by looking at them is a figure of speech, not a manifestation of a hallucination, and drawing analogies to creatures of Greek mythology is not evidence of psychosis." Appellee's Brief at

---

[4] The PSI indicates under the heading "Mental Health":

> [Haug] reported he believes he has suffered from depression for "most of my life." [He] stated he does not believe he has ever been formally diagnosed with depression as, "(I) don't trust doctors." [He] stated he believes his mental health is, "Excellent, the best it's ever been," due to having been "born again" or "Dying to Self." [He] added he attended parenting classes while participating in the HOCCS Day Reporting program in the 1990's, and "may have" received a mental health evaluation following a DCS referral in approximately 2017. [He] indicated he does not believe he has ever been diagnosed with a mental illness. [He] reported he contemplated suicide at the age of fifteen; however [he] stated he did not follow through with the attempt and has not had any suicide attempts or thoughts of suicide since.

Appellant's Appendix Volume II at 93.

22. It also contends that the trial court properly did not *sua sponte* rescind Haug's self-representation midway through trial and that it would have committed constitutional error if it had done so.

[26] The Sixth Amendment, applicable to the states through the Fourteenth Amendment, guarantees a criminal defendant the right to counsel before he may be tried, convicted, and punished. *Hopper v. State*, 957 N.E.2d 613, 617 (Ind. 2011). This protection also encompasses an affirmative right for a defendant to represent himself in a criminal case. *Id.* Generally, when a criminal defendant waives his right to counsel and elects to proceed pro se, we must decide whether the trial court properly determined that the defendant's waiver was knowing, intelligent, and voluntary. *Jones v. State*, 783 N.E.2d 1132, 1138 (Ind. 2003). Waiver of assistance of counsel may be established based upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused. *Id.* There are no prescribed "talking points" the court is required to include in its advisement to the defendant; it need only come to a considered determination that the defendant is making a voluntary, knowing, and intelligent waiver. *Poynter v. State*, 749 N.E.2d 1122, 1126 (Ind. 2001). The defendant should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open. *Leonard v. State*, 579 N.E.2d 1294, 1295 (Ind. 1991).

[27] In reviewing the adequacy of a waiver, we consider four factors: (1) the extent of the court's inquiry into the defendant's decision, (2) other evidence in the

record that establishes whether the defendant understood the dangers and disadvantages of self-representation, (3) the background and experience of the defendant, and (4) the context of the defendant's decision to proceed *pro se*. *Kubsch v. State*, 866 N.E.2d 726, 736 (Ind. 2007), *reh'g denied*, *cert. denied*, 553 U.S. 1067, 128 S. Ct. 2501 (2008). The trial court is in the best position to assess whether a defendant has knowingly and intelligently waived counsel. *See Poynter*, 749 N.E.2d at 1128 (citation omitted). Under the fourth factor, the court considers whether the defendant's decision appears tactical or strategic in nature or seems manipulative and intending delay, inferring knowledge of the system and understanding of the risk and complexities of trial from more deliberative conduct. *Id.* at 1128 n.6. We will most likely uphold the trial judge's decision to honor or deny the defendant's request to represent himself where the judge has made the proper inquiries and conveyed the proper information, and reaches a reasoned conclusion about the defendant's understanding of his rights and voluntariness of his decision. *See id.* (citation omitted). A trial court's decision to direct standby counsel to take over at any point during the proceedings is discretionary. *Sherwood v. State*, 717 N.E.2d 131, 135 n.2 (Ind. 1999).

[28] The United States Supreme Court has described the fundamental nature of the right to self-representation:

> It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. But where the defendant will not voluntarily accept representation by counsel, the potential advantage of a

lawyer's training and experience can be realized, if at all, only imperfectly. To force a lawyer on a defendant can only lead him to believe that the law contrives against him. Moreover, it is not inconceivable that in some rare instances, the defendant might in fact present his case more effectively by conducting his own defense. Personal liberties are not rooted in the law of averages. The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of that respect for the individual which is the lifeblood of the law.

*Faretta v. California*, 422 U.S. 806, 834, 95 S. Ct. 2525, 2540-2541 (1975) (citation omitted).

[29]  "That said, the right of self-representation, like most constitutional rights, is not absolute." *Sturdivant v. State*, 61 N.E.3d 1219, 1224 (Ind. Ct. App. 2016), *trans. denied*. In *Indiana v. Edwards*, the Supreme Court held that a trial court can insist upon representation by counsel for those defendants who "suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." 554 U.S. 164, 178, 128 S. Ct. 2379, 2388 (2008). A competency determination to proceed pro se involves a fact-sensitive evaluation of the defendant's capabilities that the trial court is best-situated to make. *Edwards v. State*, 902 N.E.2d 821, 824 (Ind. 2009). The trial court's determination of competence to act pro se is reviewed under the clearly erroneous standard. *Id.* We can either resolve the issue on the record before us or remand for a hearing in which the issue is Haug's mental illness as of the

time of trial. *See id.* at 825. "[R]etrospective competency hearings are generally disfavored." *Id.* "A nunc pro tunc competency determination is nevertheless permissible 'whenever a court can conduct a meaningful hearing to evaluate retrospectively the competency of the defendant.'" *Id.* (quoting *Maynard v. Boone*, 468 F.3d 665, 674-675 (10th Cir. 2006)).

[30]  Haug acknowledges that the trial court adequately advised him of the dangers of self-representation and the benefits of counsel, repeatedly asked him to verify that he wished to continue representing himself, and advised him of his *Dowell* rights. To the extent that he asserts that the trial court should have reconsidered its position in believing that he intelligently waived the right to counsel and should have directed standby counsel to take over, we disagree. The record reveals that Haug indicated that he was employed before his arrest. He stated that he suffered a head injury twenty-one years ago, underwent rehab, and subsequently received his GED. He reported that the head injury did not affect his ability to speak, listen, read, write, or communicate. While he indicated he had a stroke in 2001, he stated that he had no cognitive problems or functional deficits as a result. The trial court and prosecutor engaged in extensive colloquies with Haug regarding the dangers and disadvantages of self-representation. The exchange between the court and Haug shows that he understood that the court believed that he should be represented by counsel and may be disadvantaged by not having an attorney. Attorney Lidy, Haug's counsel at the November 27, 2018 hearing, stated that he spent a considerable amount of time with Haug, Lidy never questioned Haug's competency or

ability to understand, and that Haug had no trouble understanding him. The trial court was in the best position to observe Haug's demeanor. We conclude that the trial court's inquiry and Haug's responses were sufficient to establish that he made his decision to represent himself knowingly, voluntarily, and intelligently. While some of Haug's statements were strange and he lacked the legal skills of an experienced criminal defense attorney, we cannot say that his statements were indicative of "severe mental illness" as contemplated by *Indiana v. Edwards*. *See Sturdivant*, 61 N.E.3d at 1224-1225 (holding that, "[w]hile some of Sturdivant's statements were undeniably strange, and she clearly lacked the legal skills of an experienced criminal defense attorney, this is not the stuff of 'severe mental illness' under *Indiana v. Edwards*").[5] We cannot say that the trial court's decision to allow Haug to represent himself was clearly erroneous or that the court's failure to *sua sponte* direct standby counsel to take over the case based upon Haug's confusion regarding certain words during the discussion of the instructions warrants reversal.

II.

---

[5] The defendant in *Sturdivant* made statements before and during trial including: "The Constitution of the citizens rights state a person cannot pass or bridge any law to violate a person's constitutional right. It's wrote on eight and a half by eleven, a legal documentation, it's eight and a half by fourteen, to the clerk," "you can't use State laws to run your courtroom," "state laws are prohibited I believe by a couple of the amendments, of the Bill of Rights," "Indiana can't have a constitution," objecting to the proceeding based on "Mayberry [Marbury] vs. Madison," arguing that "judicial immunity [is] unconstitutional," pointing out to a testifying officer that "treason is punishable by death," and asking "If I'm found guilty, am I going to be executed?" *Sturdivant*, 61 N.E.3d at 1224-1225.

[31]     The next issue is whether Haug's sentence violates double jeopardy. Haug argues that the convictions entered on Counts II and III must be vacated. The State agrees that the proper remedy for the double jeopardy issue related to Count III, aggravated battery, is to vacate that conviction rather than simply merge it into the murder conviction. It also acknowledges that the conviction for Count II, criminal confinement, should be vacated because, given the evidence and the prosecutor's argument, there is a reasonable probability that the jury relied upon the evidence of the confinement used to accomplish the murder to support the confinement in Count II.

[32]     The Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." Ind. Const. art. 1, § 14. "Indiana's Double Jeopardy Clause . . . prevent[s] the State from being able to proceed against a person twice for the same criminal transgression." *Hopkins v. State*, 759 N.E.2d 633, 639 (Ind. 2001) (quoting *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999)). The Indiana Supreme Court has held that "two or more offenses are the 'same offense' in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Richardson*, 717 N.E.2d at 49.

[33]     Generally, a double jeopardy violation under the actual evidence test occurs when there is a reasonable possibility that the evidentiary facts used by the factfinder to establish the essential elements of an offense for which the

defendant was convicted may also have been used to establish all the essential elements of a second challenged offense. *Hines v. State*, 30 N.E.3d 1216, 1222 (Ind. 2015); *Vestal v. State*, 773 N.E.2d 805, 806 (Ind. 2002), *reh'g denied*. "[A] 'reasonable possibility' that the jury used the same facts to reach two convictions requires substantially more than a logical possibility." *Garrett v. State*, 992 N.E.2d 710, 719 (Ind. 2013) (quoting *Lee v. State*, 892 N.E.2d 1231, 1236 (Ind. 2008)). The existence of a reasonable possibility turns on a practical assessment of whether the fact-finder may have latched on to exactly the same facts for both convictions. *Id.* at 720. "Application of this test requires the court to 'identify the essential elements of each of the challenged crimes and to evaluate the evidence from the jury's perspective . . . .'" *Hines*, 30 N.E.3d at 1222 (quoting *Lee*, 892 N.E.2d at 1234 (quoting *Spivey v. State*, 761 N.E.2d 831, 832 (Ind. 2002))). The Indiana Supreme Court has determined the possibility to be remote and speculative and therefore not reasonable when finding no sufficiently substantial likelihood that the fact-finder used the same evidentiary facts to establish the essential elements of two offenses. *Hopkins*, 759 N.E.2d at 640 (citing *Long v. State*, 743 N.E.2d 253, 261 (Ind. 2001), *reh'g denied*; *Redman v. State*, 743 N.E.2d 263, 268 (Ind. 2001)). "In determining the facts used by the fact-finder, 'it is appropriate to consider the charging information, jury instructions, [ ] arguments of counsel' and other factors that may have guided the jury's determination." *Hines*, 30 N.E.3d at 1222 (quoting *Lee*, 892 N.E.2d at 1234 (citing *Spivey*, 761 N.E.2d at 832, and *Richardson*, 717 N.E.2d at 54 n.48)).

[34]    With respect to Count III, aggravated battery as a level 3 felony, we observe that the prosecutor stated: "I think the State will concede that aggravated battery and murder merge. So, from the State's perspective there's no need to sentence separately on counts one and count three." Transcript Volume IV at 159. The trial court's order entered judgment with respect to Count III and stated that "[t]he Sentence for counts 1 and 3 shall be merged." Appellant's Appendix Volume II at 107. We conclude that this was insufficient to cure the double jeopardy violation and we remand to vacate the conviction under Count III. *See Bass v. State*, 75 N.E.3d 1100, 1103 (Ind. Ct. App. 2017) (observing that "[i]n a document captioned 'Judgment,' the trial court acknowledged that [the defendant] had been found guilty of both the Class A misdemeanor and the Class C misdemeanor before then declaring that the two counts merged for purposes of sentencing," holding that this was not a sufficient remedy to the apparent double jeopardy concern, and reversing and remanding with instructions to vacate the defendant's conviction for the class C misdemeanor); *West v. State*, 22 N.E.3d 872, 875 (Ind. Ct. App. 2014) ("A trial court's act of merging, without also vacating the conviction, is not sufficient to cure a double jeopardy violation."), *trans. denied*.

[35]    As for Count II, criminal confinement as a level 3 felony, Miller testified that Haug was choking Walden when she left to obtain help and that he was still choking him when she returned about a minute and a half or two minutes later. She also testified that she never saw Walden in control and that it was all one sided. During closing argument, the prosecutor stated that "at all times [Haug]

was always in control" and "was always in a superior position," and that Haug did not stop and strangled Walden. Transcript Volume IV at 125. In light of the State's concession and the record, we vacate Haug's conviction under Count II. *See Lowrimore v. State*, 728 N.E.2d 860, 868 (Ind. 2000) (vacating conviction for confinement where jury was presented "the same evidentiary facts—the suffocation and choking of Lawyer—to prove both the murder charge and the criminal confinement charge"), *reh'g denied*; *Newgent v. State*, 897 N.E.2d 520, 529 (Ind. Ct. App. 2008) (vacating confinement conviction to eliminate double jeopardy with murder conviction).

[36] For the foregoing reasons, we affirm Haug's conviction for murder, reverse his convictions for criminal confinement and aggravated battery, and remand for the trial court to enter a sentence consistent with this opinion.

[37] Affirmed in part, reversed in part, and remanded.

Altice, J., and Tavitas, J., concur.